IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LANCE CONWAY WOOD,

                  Plaintiff,

      v.

SUE WASHBURN, Superintendent of
Eastern Oregon Correctional Institution;
MOLISSA NOFZIGER, Assistant Inspector
General for Oregon Department of
Corrections; JERRY PLANT, Inspector 3
FOR ODOC; and HEATHER NEVIL,
Hearing Officer for EOCI, all named
defendants are sued in their individual and
official capacities,

                  Defendants.

Case No. 2:20-cv-00362-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       Plaintiff Lance Conway Wood ("Wood"), a self-represented adult in custody ("AIC") at

the Eastern Oregon Correctional Institution ("EOCI"), filed this civil rights action against

Oregon Department of Corrections ("ODOC") officials Sue Washburn, EOCI Superintendent

("Washburn"), Melissa Nofziger,[1] an ODOC assistant inspector general ("Nofziger"), Jerry

Plante, an ODOC inspector ("Plante"), and Heather Nevil, an ODOC disciplinary hearing officer

("Nevil") (together, "Defendants") under 42 U.S.C. § 1983, alleging that Defendants violated his

constitutional rights under the First, Eighth, and Fourteenth Amendments.[2]

Now before the Court is Wood's motion for summary judgment (ECF. No. 115) and

Defendants' motion for summary judgment (ECF No. 117). The parties have consented to the

jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). For the following reasons,

the Court denies Wood's motion for summary judgment and grants Defendants' motion for

summary judgment.

## BACKGROUND[3]

Wood began working as a legal clerk in the EOCI law library on March 20, 2018. (Decl.

of Sue Murphy in Supp. of Defs.' Mot. for Summ. J. ("Murphy Decl.") ¶ 5.) Through his role in

the law library, Wood claims he became aware of a rise in violence among AICs, staff assaults,

and suicide attempts. (FAC ¶¶ 9, 13.) As a result, in August 2019, Wood notified his supervisor

that he intended to gather statements from other AICs to prepare a class action lawsuit

concerning what Wood believed to be several constitutional violations occurring at EOCI. (*Id.*)

---

[1] Although identified in several pleadings as Molissa Nofziger, the correct spelling is Melissa Nofziger. (*See* Decl. of Melissa Nofziger in Supp. of Defs.' Resp. to Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Nofziger Decl."), ECF No. 48.)

[2] Wood identifies his claim against Nevil as arising under the Fourth Amendment, but he alleges a violation of his "due process rights." (*See* First Am. Compl. ("FAC") at 14, ¶ A; *see also* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 8, citing to the Fourth Amendment but arguing that Defendants committed "[d]ue [p]rocess [v]iolations"). The Court construes Wood's claim as arising under the Fourteenth Amendment.

[3] Unless otherwise noted, the following facts are undisputed or presented in the light most favorable to the non-moving party. The Court cites to Wood's complaint where Wood has not submitted any evidence in support of his claims.

Wood alleges that he requested that Washburn allow him to meet with other AICs for that purpose. (*Id.*) Wood claims Washburn did not respond to his request. (*Id.*) Wood then asked another supervisor to assist Wood in obtaining permission to gather information needed to initiate the class action lawsuit against EOCI. (FAC ¶ 14.) Wood was later informed that "they were working on it."[4] (*Id.*)

On October 21, 2019, EOCI required Wood and other AICs to provide urine samples. (*Id.* ¶ 15.) When doing so, Wood became concerned that another AIC, rather than an EOCI staff member, gathered and handled the urine samples. (Decl. Lance Wood Supp. Pl.'s Mot. Prelim. Inj. ("Wood Decl.") ¶ 1, ECF No. 8.)[5] EOCI Officer Robbins, who was present for Wood's urine sample collection, "waived off" Wood's concern. (*Id.*) Wood's urine sample tested positive for Tramadol, a prescribed medication and controlled substance. (Decl. Heather Nevil Supp. Defs.' Mot. Summ. J. ("Nevil Decl.") ¶ 12, Ex. 3.) Wood was not prescribed Tramadol on or near the date he provided the urine sample. (*Id.*)

On November 6, 2019, Officer B. Keller issued a misconduct report charging Wood with two violations related to his urine sample results: Contraband I and Disobedience of an Order. (*Id.*) The same day, Wood was removed from his position as law clerk for the EOCI law library pending the outcome of a disciplinary hearing for the alleged misconduct. (Murphy Decl. ¶¶ 5-6.)

///

---

[4] Wood states that his supervisor, "Ms. Tirpining," spoke to "Mr. Miles" about Wood's request to gather information for a class action lawsuit, but it is unclear who told Wood his request was being "work[ed] on." (*See id.*)

[5] The record contains several declarations submitted by Wood. For ease of reference, the Court includes ECF citations.

On November 12, 2019, Nevil conducted a disciplinary hearing related to Wood's misconduct report. (Nevil Decl. ¶ 11.) At the hearing, Wood testified that he did not provide his urine sample to Officer Brown as stated in the misconduct report. (*Id.* ¶ 17.) Nevil noted to Wood that Officer Robin, not Officer Brown, had signed off on the sample, but Wood responded that it was an AIC, not an EOCI staff member, who had collected the urine sample. (*Id.*) Nevil suspended the hearing to investigate Wood's allegation that another AIC had collected his urine sample. (*Id.* ¶ 18.) Nevil then discovered that Assistant Inspector General Kraig McGlathery had already assigned Plante to investigate concerns raised in a letter Wood's wife had sent to Deputy Inspector General Jason Brown regarding EOCI's urine sample collection procedures. (Nevil Decl. ¶¶ 19, 23, Ex. 7; Decl. Lance Wood Supp. Pl.'s Mot. Sanctions ("Wood Decl."), Ex. C, ECF No. 64.)

On November 19, 2019, Plante interviewed Wood as part of the investigation and informed Wood that he had reviewed surveillance video of Wood's urine sample collection but did not see anyone tamper with Wood's sample. (Nevil Decl. ¶ 23, Ex. 6, at 6.) Plante also indicated to Wood that he "would agree that another AIC should not be involved with the urine collection process," but "did not see any type of misconduct," and he did "not know what the [urine sample c]ollection procedure is at [EOCI]." (*Id.*) On December 2, 2019, Nevil reviewed the surveillance video and Plante's report. (Nevil Decl. ¶ 22.)

On December 3, 2019, Nevil reconvened Wood's disciplinary hearing, informed Wood of the non-confidential evidence against him, and gave Wood an opportunity to testify. (*Id.* ¶ 24.) Based on the evidence and Wood's testimony, Nevil found that Wood violated ODOC Rule 1.10.03, Contraband I, and recommended sanctions including credit for twenty-eight days that Wood already served in disciplinary segregation, ten days loss of privileges, restitution to cover

the cost of the urinalysis test, and a $50 fine.[6] (*Id*. ¶¶ 27-28.) Had Nevil not found Wood in violation of Contraband I, he could have returned to his work assignment as a law clerk at the EOCI law library. (Murphy Decl. ¶ 8.)

Wood timely sought administrative review of Nevil's decision, arguing, *inter alia*, that (1) Oregon administrative rules governing the collection of urine samples were not followed because another AIC—rather than an EOCI officer—took Wood's sample; (2) the misconduct report contained errors relating to the chain of custody of Wood's urine sample; and (3) the sanctions constituted "retaliation and harassment based on [Wood's] litigation and planned future litigation against EOCI staff, and for the purpose to have [Wood] removed from [his] position/employment as the law library clerk." (Nevil Decl. ¶ 29, Ex. 10, at 1-2.) On January 23, 2020, Nofziger found that Nevil's decision was based on a preponderance of the evidence and the sanctions imposed were in accordance with ODOC rules. (*Id*. ¶ 29, Ex. 11.)

## LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (simplified).

---

[6] Nevil dismissed the Disobedience of an Order charge for lack of evidence. (*Id*.)

Courts generally construe *pro se* "pleadings liberally and afford[] [a self-represented plaintiff] the benefit of any doubt." *Wilson v. Peters*, No. 2:19-cv-01724-AC, 2020 WL 6437606, at *3 (D. Or. Sept. 25, 2020) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), *findings and recommendation adopted*, 2020 WL 6393901 (D. Or. Nov. 2, 2020). However, "there is no authority for the proposition that, on motion for summary judgment, that [liberal construction] rule operates to lighten the *pro se* litigant's obligation to show a genuine issue of material fact for trial through the presentation of specific, admissible evidence." *Id.* (citation omitted).

Where parties file cross motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (simplified); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## DISCUSSION

## I.    WOOD'S MOTION FOR SUMMARY JUDGMENT

Wood argues that the Court should enter summary judgment on his claims because Defendants committed fraud upon the Court by submitting contradictory answers in response to Wood's original complaint and FAC, and conflicting admissions in requests for admission. (Pl.'s Mot. at 2-4.) For the reasons discussed below, the Court denies Wood's motion for summary judgment.

///

///

### A.    Applicable Law

"When [a court] conclude[s] that the integrity of the judicial process has been harmed . . . to the level of 'an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,' [the court] not only can act, [it] should." *Dixon v. Comm'r*, 316 F.3d 1041, 1046 (9th Cir. 2003) (citing *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960)). Allegations of fraud upon the court arise in two contexts: (1) before an adjudication; and (2) where a party seeks to overturn a final judgment, usually under FED. R. CIV. P. 60(b). *See Synanon Church v. United States*, 579 F. Supp. 967, 974 (D.D.C. 1984). A claim of fraud on the court is "available only to prevent a grave miscarriage of justice." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir. 2003) (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)).

"Generally, non-disclosure by itself does not constitute fraud on the court." *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999) (citing *England*, 281 F.2d at 310). "Similarly, perjury by a party or witness, by itself, is not normally fraud on the court." *Id.* (declining to find fraud upon the court and reasoning that "the plaintiff had the opportunity to challenge the alleged perjured testimony or non-disclosure because the issue was already before the court" (citing *Gleason v. Jandrucko*, 860 F.2d 556, 559-60 (2d Cir. 1988))); *see also Gleason*, 860 F.2d at 560 (holding that "neither perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant" and explaining that "credibility and veracity of a witness at issue in an original proceeding cannot be later challenged by way of an independent action").

A fraud on the court requires "a fraud that is aimed at the court." *Appling*, 340 F.3d at 780. "[T]he burden is on the moving party to establish fraud by clear and convincing evidence." *England,* 281 F.2d at 309 (citation omitted).

///

///

### B.    Analysis

On July 8, 2020, Defendants admitted certain facts in Wood's original complaint as true, including that: (1) the AIC gathering urine samples on the relevant date had "handled all the [other AICs'] urine samples prior to handling Wood's[;]" (2) while Wood's urine specimen cup "remained exposed for about twenty minutes . . . several prisoners walked by and acted like they poured urine into [Wood's] two exposed urine sample cups[;]" (3) the AIC gathering urine samples handled Wood's specimen cups after handling other AIC's samples and urine had "spilled out onto the [collecting AIC's] hand[,]" including the urine of an AIC that was medically prescribed Tramadol; (4) the urine sample was placed in a bag along with other AIC urine samples then taken to a room that officers and other AICs had access to; and (5) EOCI did not follow the proper procedures for AIC urine sample collection. (*See* Pl.'s Compl. ¶¶ 17-21, ECF No. 1; Defs.' Answer ¶ 1, ECF No. 21.)

Wood filed his FAC on August 2, 2021, adding additional claims but relying on the same facts alleged in his original complaint. (*Compare* Pl.'s Compl. ¶¶ 1-28 *with* FAC ¶¶ 1-28.) Defendants' answer to Wood's FAC denied the allegations related to Wood's urine sample collection that they had previously admitted. (*See* Defs.' Answer FAC ¶¶ 1-2, ECF No. 102.) Defendants offered no explanation for denying facts previously admitted. (*Id.*) Wood also alleges that Defendants' responses to his requests for admission contain conflicting admissions related to Wood's misconduct report and whether Wood's urine sample was collected in accordance with the administrative rules. (*See* Pl.'s Mot. at 3-4.)

Wood argues that the "variation in facts cannot be chalked-up to simple mistake, mismanagement, or attorney oversight" because Defendants failed to take any action to amend the admissions in their original answer before filing an answer to Wood's FAC more than one year later. (*Id.* at 4.) Wood also claims that Defendants provided responses to Wood's requests

for admission that are contradicted by objective surveillance video evidence. (*Id.* at 5.) Wood concludes that Defendants' conduct amounts to fraud upon the court because Defendants' counsel "was legally obligated to correct the court record to clarify [D]efendants['] inconsistencies [but i]nstead counsel enabled [D]efendants['] fraudulent facts to metastasize, thus edging [this Court] towards omitting facts first conceded . . . [and] currently den[ied.]" (*Id.* at 7.)

In response, Defendants argue that their answer to Wood's FAC "supersedes any earlier answer that [they] filed." (Defs.' Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") at 2) (citation omitted). Defendants argue that "the at-issue responses to [Wood's FAC] in [D]efendants' answer are either in the nature of a legal conclusion rather than an admission of fact . . . or [are] insufficient to create any material issue of fact that would entitle [Wood] to take relief in this case." (*Id.*).

The Court agrees that Defendants' answer to Wood's FAC supersedes their answer to Wood's original complaint, and that therefore Defendants are not bound by the admissions they made in the original answer. *See Huey v. Honeywell, Inc., 82 F.3d 327, 333 (9th Cir. 1996)* ("When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission[.]") (citation omitted). However, if this case were to proceed to trial, Defendants' earlier contradictory "admissions are still admissible evidence, though not conclusive, like any other extrajudicial admission made by a party or its agent." *Id.*

Nevertheless, Wood is not entitled to summary judgment based on Defendants' contradictory answers and inconsistent discovery responses because Wood has not met his burden of establishing that Defendants engaged in fraud aimed at the Court. *See, e.g., Appling, 340 F.3d at 780* (holding that the district court did not abuse its discretion in dismissing a fraud

upon the court claim where the defendants' "actions, even if they did occur as alleged, were aimed only at the [plaintiff] and did not disrupt the judicial process because the [plaintiff] through due diligence could have discovered the non-disclosure"); *cf. Lawshe v. Amerus Life Ins. Co., 19 F. App'x 692, 695 (9th Cir. 2001)* ("We do not hold that a factual conflict produced entirely by one party's contradictory statements necessarily renders summary judgment unavailable. It may be that earlier admissions can be explained to such a degree that there will be no genuine issue of material fact, but on the record now before us we cannot say that this has been done.").

Accordingly, the Court denies Wood's motion for summary judgment.

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on several grounds, including that (1) Nevil provided Wood with all process he was due; (2) Washburn, Nofziger, and Plante did not engage in any conduct that would implicate Wood's due process rights; (3) Wood's First Amendment claim fails as a matter of law; (4) Wood failed to exhaust his Eighth Amendment claim; (5) Wood has not alleged the type of injury required for an Eighth Amendment claim; and (6) Defendants are entitled to qualified immunity from money damages. (*See* Defs.' Mot. Summ. J. ("Defs.' Mot.") at 2.)

### A.    Applicable Law

Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *42 U.S.C. § 1983.* "To state a claim under [Section] 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Naffe v. Frye, 789 F.3d 1030, 1035-36 (9th Cir. 2015)* (quoting *West v. Atkins, 487 U.S. 42, 48 (1988)*).

"A cognizable claim under Section 1983 also requires an [AIC] to show causation; that a particular defendant engaged in 'an affirmative act, participat[ed] in another's affirmative act, or omit[ted] to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Wilson*, 2020 WL 6437606, at *3 (citing *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) and quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

**B.     Analysis**

      **1.     Fourteenth Amendment Claims**

Liberally construed, Wood claims that Defendants denied him his right to procedural and substantive due process under the Fourteenth Amendment in connection with his disciplinary hearing.

      **a.     Applicable Law**

The Fourteenth Amendment prohibits the government from depriving a person of life, liberty, or property without due process of law. U.S. CONST. AMEND. XIV.

Analysis of procedural due process claims involves a two-step inquiry: (1) whether the state interfered with an AIC's protected liberty or property interest, and (2) whether procedural safeguards were constitutionally sufficient. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (applying the two-step due process inquiry and holding that Kentucky regulations did not provide AICs a constitutionally-protected liberty interest in receiving visitors); *see also Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998) (requiring the plaintiff claiming a due process violation to prove that both elements of the two-step inquiry were "clearly established" in his favor).

"To comply with due process requirements during inmate disciplinary proceedings, prison officials must provide an [AIC] with: (1) written notice of the charges; (2) some time

following the notice to prepare a defense; (3) a written decision by the fact-finder; (4) the opportunity to call witnesses and present documentary evidence in his defense when consistent with institutional safety and correctional goals; and (5) assistance from staff or other [AICs] if the [AIC] is illiterate or if the case is extremely complex." *Calderon v. Dezi*, No. 2:17-cv-01625-JR, 2018 WL 4705537, at *4 (D. Or. Oct. 1, 2018) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974)).

Further, substantive due process requires that "some evidence" support a prison disciplinary decision. *Supt., Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *see also Williams v. Thomas*, 492 F. App'x 732, 734 (9th Cir. 2012) ("[D]ue process requires that there be 'some evidence in the record' supporting the decision by the prison[.]" (citing *Hill*, 472 U.S. at 454)).

### b.    Analysis

#### 1)    Due Process Claims against Nevil

Nothing in the record suggests that Wood is illiterate or required assistance due to the complexity of his case, nor that Defendants failed to provide Wood with written notice of the charges, some time to prepare a defense, or a copy of Nevil's written decision. (*See* Nevil Decl., Ex. 5, at 1, disciplinary hearing testimony demonstrating that Wood received, read, and understood the misconduct report; *see also* Nevil Decl. Ex. 10, demonstrating that Wood sought administrative review of Nevil's decision and challenged Nevil's factual findings.) Therefore, the issues in dispute relevant to the due process analysis are whether Nevil provided Wood with a sufficient opportunity to call witnesses and present documentary evidence at his disciplinary hearing, and whether some evidence supported Nevil's disciplinary decision.

///

///

### a)    Procedural Due Process

The record demonstrates that Nevil advised Wood of his right to call witnesses and present evidence as part of his defense, and that Wood made statements on his own behalf.[7] (*See* Nevil Decl., Ex. 1, demonstrating that the rules of prohibited conduct advise AICs that they "will be allowed to speak on his/her behalf, exercise his/her rights, and submit evidence[,]" Exs. 5, 8, disciplinary hearing testimony demonstrating that Wood acknowledged that he received a copy of the rules of prohibited conduct and made statements on his own behalf.) Further, after Wood informed Nevil that the misconduct report contained inaccurate information and that the Oregon administrative rules for urine sample collection were not properly followed, Nevil recessed the hearing to review the video evidence. (*Id.* ¶¶ 5-6, 18.) On December 2, 2019, Nevil reviewed four surveillance videos and Plante's investigation report. (*Id.* ¶ 22.)

Wood's disciplinary hearing reconvened on December 3, 2019. (*Id.* ¶ 24.) Nevil explained to Wood that the hearing had been delayed so that she could review evidence related to Wood's "concern[s] that an [AIC] who handled the sample had tampered with [it or that] it had been cross contaminated possibly." (*Id.* Ex. 8, at 3.) Nevil then stated that she "relied on making an assessment from the investigative report that was provided by Plante." (*Id.*)

Wood argues that Nevil improperly prevented him from reviewing Plante's report. (*See* Pl.'s Opp'n at 5; *see also* Nevil Decl., Ex. 8, demonstrating that Nevil did not provide Wood the investigative report, citing confidentiality.) Defendants acknowledge that Nevil withheld Plante's investigation report, but argue that the report was "appropriately withheld" "due to security concerns." (Defs.' Reply at 11.) According to Defendants, "reports such as the one at issue are

---

[7] The record also demonstrates that Wood requested a copy of the toxicology report, but Nevil denied the request. (*Id.* Ex. 5, at 4.) Wood does not allege that this denial of evidence impacted his ability to defend himself.

confidential because in the underlying report, the inspector describe[s] his or her investigative process and techniques in detail[,] ODOC never shares its investigators' reports with its AICs, because ODOC does not want its investigators' techniques to be made public [and] doing so would give AICs the information that they need to circumvent ODOC's processes." (Nofziger Decl. ¶ 7.)

Nevil did, however, inform Wood that "in the end [Plante] says . . . there's no evidence that the sample was tampered with[.]" (*Id.* Ex. 8, at 4.) Nevil then summarized Plante's report for Wood, including that it included a "laundry list [of] all the people that were involved, which facility, what dates and times[,] the time that it [] occurred, time that it reported, time that it was completed, who the complainant was, [and] people that were mentioned in the investigation." (*Id.*) Nevil explained that the report included eight exhibits, a letter received from Rene Wood, the laboratory drug test report, a copy of the toxicology lab test results, a memorandum from Officer Robins, a memorandum from Officer Brown, EOCI security video, the audio recording of Wood's initial disciplinary hearing, and the Oregon administrative rules for drug analysis testing. (*See id.*)

Nevil then explained to Wood that "the work that I do here is based on a preponderance of the evidence . . . it's a very low threshold . . . [and a]ll of the evidence that I've been provided for consideration actual hard evidence indicates that you did provide a sample that did test positive for Tramadol." (*Id.*) Nevil concluded that Wood had violated Rule 1.10.03, Contraband I, and dismissed without discussion the second charge of disobedience of an order. (*Id.* Ex. 8, at 6.) When Nevil asked Wood at the conclusion of the hearing if there was "[a]nything else?" Wood responded "[n]o, that's good." (*Id.* at 8.)

///

Wood argues that Nevil should have dismissed the misconduct report or required it to be rewritten because it contained "false" information—i.e., that an EOCI officer collected Wood's urine sample, when in fact an AIC had collected the sample. (Pl.'s Opp'n at 15.) However, Nevil provided Wood with an opportunity to be heard regarding the inconsistencies in the report, and reviewed the relevant video footage of the urine collection to evaluate Wood's challenge before reconvening the disciplinary hearing. Nevil weighed the relevant documentary evidence and testimony and reached a conclusion, explaining to Wood the low evidentiary threshold required to find a disciplinary violation. Due process principles do not require Nevil to rewrite an investigation report to correct inaccuracies, especially where the record is clear that Nevil considered Wood's objections to the report by reviewing the relevant video evidence.

Wood submits evidence purporting to demonstrate that Nevil has previously dismissed other AICs' misconduct reports for containing inaccurate information. (*See* ECF Nos. 151-52, 154.) These declarations, however, demonstrate that Nevil dismissed other AICs' misconduct reports or required them to be re-written where "additional information [was] necessary to process [the] case" or where there was "insufficient evidence" to substantiate the underlying charge. (*See id*.) In contrast here, Wood's misconduct report included sufficient information to substantiate the charge of Contraband I. (*See* Nevil Decl., Ex. 3.) Specifically, Wood provided a urine sample that tested positive for a prohibited substance. As discussed below, that was enough evidence to support Nevil's disciplinary order.

In sum, Wood received written notice of the charge, sufficient time to prepare a defense, and an opportunity to present a defense. Further, Nevil issued a written decision, and appropriately withheld Plante's report from Wood for the legitimate penological reason of

confidentiality and institutional security.[8] (*See* Nofziger Decl. ¶¶ 7-12); *see also Calderon*, 2018 WL 4705537, at *4 (summarizing due process requirements for AIC disciplinary proceedings (citing *Wolff*, 418 U.S. at 563-72)). The Court finds that Nevil satisfied the procedural due process requirements for an AIC's disciplinary hearing.

### b)    Substantive Due Process

With respect to whether "some evidence" supported Nevil's disciplinary decision, Wood argues that there was insufficient evidence for Nevil to find a disciplinary violation in light of the improper collection, tampering, and cross-contamination of his urine sample. Defendants argue that Nevil's "decision on the Contraband I rule violation passes constitutional muster[.]" (Defs.' Mot. at 12.) The Court finds that Nevil's disciplinary decision satisfied the Constitution's minimally stringent standards.

Nevil was aware that Wood's defenses for the positive urine sample included improper collection, tampering, and cross-contamination. (*See* Nevil Decl., Ex. 8, at 1, 3, Nevil speaking to Wood, "[y]ou had some concern with regard to how the [urine sample] collection process worked" and "[y]ou were concerned what an [AIC] who handled the sample had tampered with [the sample and t]hat it had been cross-contaminated possibly[.]"). The record reflects that Nevil evaluated Wood's defenses, but nevertheless concluded that Wood violated Contraband I, relying in large part on "the investigative report that was provided by Plante." (*Id*. Ex. 8, at 3.)

Plante's report, in turn, includes a detailed summary of what Plante observed with respect to the urine collection in four surveillance videos. (*See id*. Ex. 6, at 3-5.) The summary confirms

---

[8] In response to a motion to compel, the Court previously concluded that while "Defendants appropriately withheld" certain exhibits attached to Plante's report "on institutional security grounds[,]" "Defendants could produce without compromising institutional security or investigative methods" other portions of the report. (ECF No. 65.)

that another AIC[9] (the "assisting AIC")—not an EOCI staff member—collected Wood's urine sample.[10] (*Id.*) Plante notes that the assisting AIC was wearing "latex gloves the whole time," and that the assisting AIC was already wearing gloves at the beginning of the video. (*Id.* Ex. 6, at 3.) Plante does not address whether the assisting AIC's gloves were new, or whether he wore the same gloves while collecting urine samples from other AICs.

After viewing the videos, Plante interviewed Wood. (*Id.* Ex. 6, at 5.) Among other concerns not relevant here, Plante reported that Wood told him that "another [AIC] was helping during the collection process and this [AIC] was not changing his gloves between new samples" and therefore, Wood felt "there was 'cross contamination' to his sample." (*Id.*) According to Plante, Wood "continued to imply that [the assisting AIC] may have tampered with the sample." (*Id.* Ex. 6, at 6.) Plante "told [Wood that he] had reviewed the security video and at no time did [Plante] see [the assisting AIC] or any other person, tamper with [Wood's] sample." (*Id.*) Plante said "that another AIC should not be involved with the urine collection process, but [Plante] did not see any type of misconduct done by the AIC." (*Id.*) Plante also concluded his interview with Wood by stating "I do not know what the [urine collection p]rocedure is at [EOCI]."[11] (*Id.*)

At the hearing, Nevil informed Wood that Plante was in a position to investigate Wood's claims and to "make some kind of assertion or at least assessment from his perspective[,]" and

---

[9] The name of the AIC who collected Wood's urine sample is redacted from Plante's report.

[10] Despite Plante's confirmation in his report that another AIC collected Wood's urine sample, Plante later denied that "another [AIC] collected the October 21, 2019[,] urine sample from [] Wood." (Decl. Lance Wood Support Pl.'s Mot. Summ. J. ("Wood Decl.") ¶ 2, Ex. B, Jerry Plante's Resp. Pl.'s First Set Admissions ("Plante Admissions") at 2, ECF 116.)

[11] Plante's statement in his report about not knowing about the urine collection procedure is contradicted by his later response to a request for admission admitting that "EOCI employees complied with OAR 291-042-0015 on urinalysis testing." (Plante Admissions at 3.)

that Plante's "perspective" was documented in his report, but the "investigation report is []

confidential." (*Id.* at 3.) Nevil informed Wood that "essentially what [Plante] said is that there's

no evidence that the sample was tampered with . . . which was your primary concern[.]" (*Id.* at 3-

4.)

Although the Court shares Wood's concerns that an AIC collected his urine sample in

violation of the rules, and that there was evidence that Wood's urine sample may have been

positive as a result of cross-contamination, the "some evidence" due process standard "is

minimally stringent." *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987). "[T]he relevant

question is whether there is *any* evidence in the record that *could* support the conclusion reached

by the disciplinary board." *Id.* (citing *Hill*, 472 U.S. at 455-56).

Here, there was some evidence in the record to support Nevil's conclusion that Wood

violated Rule 1.10.03, Contraband I. Wood does not deny that he provided a urine sample, and

there is no dispute that his sample tested positive for Tramadol. (*See* Nevil Decl., Ex. 7, at 3.)

Although this evidence may be "meager" in light of the fact that Wood's urine sample was

collected in contravention of Oregon administrative rules and was likely subject to cross-

contamination, the evidence is nevertheless sufficient to satisfy the minimally stringent due

process requirements for AIC disciplinary proceedings. *See Hill*, 472 U.S. at 457 ("The []

Constitution does not require evidence that logically precludes any conclusion but the one

reached by the disciplinary board . . . [and a]lthough the evidence in this case might be

characterized as meager . . . the record is not so devoid of evidence that the findings of the

disciplinary board were without support or otherwise arbitrary."); *Garcia v. Kernan*, 744 F.

App'x 486, 486 (9th Cir. 2018) ("[T]he 'some evidence' standard does not allow [this Court] to

reweigh the strength of the evidence or second-guess prison disciplinary findings." (citing *Hill*,

472 U.S. at 455)); *see also Blanco v. Robertson*, No. 18CV1909 CAB (AGS), 2020 WL 2542863, at *12 (S.D. Cal. May 19, 2020) (rejecting an AIC's argument that there was insufficient evidence to find him guilty of a rule violation where "some evidence" could support the disciplinary hearing officer's finding, reasoning that the plaintiff's "claim [that] his cellmate took full responsibility for the [contraband] 'does not change the analysis under *Hill*'") (citation omitted).

For these reasons, the Court finds that there was "some evidence" to support Nevil's finding that Wood violated Rule 1.10.03, Contraband I.[12] Accordingly, the Court grants Defendants' motion for summary judgment on Wood's due process claims against Nevil.

### 2) Due Process Claims against Nofziger, Plante, and Washburn

Defendants argue that Wood's procedural due process claims against Nofziger, Washburn, and Plante fail as a matter of law. (*See* Defs.' Mot. at 9.)

Regarding Nofziger, Defendants argue that there is no right to administrative review of a prison disciplinary hearing. (*Id*. at 9-10.) The Court agrees. "The minimum procedural due process protections required at prison disciplinary hearing [are] set forth in *Wolff v. McDonnell*."

---

[12] Wood also alleges that Nevil imposed "a harsher punishment"—including "a sentence of [twenty-eight] days, [fourteen] days loss of privileges, a $57.30 fine, and [a] two incentive level [drop]"—"th[a]n she has against other [AICs] that have been convicted of identical disciplinary offenses[,]" namely, that other AICs received twenty-day sentences and only one incentive level drop. (FAC ¶¶ 35-36, 38.) However, the evidence Wood offers in support of his claim reflects only that an AIC who used marijuana was sanctioned with a decrease of one incentive level, and there is no indication who imposed that sanction. (*See* Wood Decl., Ex. F, ECF No. 8.) In addition, contrary to Wood's assertions, the summary judgment record demonstrates that Nevil imposed sanctions of twenty-eight days in segregation as "credit for time served" because that is the amount of time Wood had already spent in segregation, imposed only ten days loss of privileges, declined to "impose the usual discipline" of restricting Wood to "basic visits," and that her decision was "the standard practice for myself in processing these types of cases." (Nevil Decl., Exs. 8-9.)

*Picket v. Williams*, No. 09-cv-689-TC, 2011 WL 4913573, at *4 (D. Or. Aug. 23, 2011), *findings and recommendation adopted*, 2011 WL 4912872 (D. Or. Oct. 12, 2011). "[A]dministrative review is not one of the minimum due process protections required." *Id.*

With respect to Plante, Defendants argue that "his only involvement . . . was investigating the circumstances surrounding the collection of [Wood's] urine sample" and procedural due process does not require than an AIC be provided with an independent investigation." (Defs.' Mot. at 10.) The Court agrees. Due process protections "do not include the right to an 'investigation.'" *Picket,* 2011 WL 4913573, at *4. Thus, Plante's limited involvement in investigating EOCI's urine sample collection process did not implicate Wood's Fourteenth Amendment rights.

Defendants further argue that Wood's due process claims against Nofziger and Washburn fail as a matter of law because "[c]laims brought under [Section] 1983 must be brought against an individual defendant for her own conduct" and Wood has "not alleged that [] Washburn or [] Nofziger were personally involved in or caused any wrongful conduct." (Defs.' Mot. at 9.)

"Liability under § 1983 arises only upon a showing of personal participation by the defendant." *Chavez v. Peters*, No. 2:16-cv-02225-MO, 2019 WL 922237, at *7 (D. Or. Feb. 25, 2019) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)). "Vicarious liability is inapplicable to a § 1983 suit—plaintiffs must plead that each defendant's individual actions has violated the Constitution." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "But a supervisor may be responsible for 'setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* (quoting *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018)).

Wood argues that Washburn's signature approving Nevil's Findings of Fact "indicate[s] she reviewed the evidence before signing off on Wood's conviction." (Pl.'s Opp'n at 12; *see also* Nevil Decl., Ex. 9, at 2.) Similarly, Wood argues that Nofziger independently reviewed the evidence purporting to support Wood's Contraband I conviction and determined that "there was substantial compliance with the rule, the finding was based upon a preponderance of the evidence and the sanction imposed was in accordance set forth in the rule." (*See* Pl.'s Opp'n at 13; *see also* Nevil Decl., Ex. 11.)

However, in reviewing and approving Nevil's findings related to Wood's Contraband I violation, Washburn and Nofziger relied on the same evidence as Nevil to support their concurrence. *See, e.g.*, *Womack v. Kelly, No. 6:19-cv-00686-JR, 2020 WL 2768687, at *4 (D. Or. May 28, 2020)* ("In reviewing and approving [the disciplinary hearing officer's] order, [the superintendent] relied on the same set of evidence to make his decision"; *see also Chavez*, 2019 WL 922237, at *8* ("[B]ecause [the defendant superintendent] approved the disciplinary and restitution orders, [the superintendent] is responsible for any constitutional violations flowing from them."). In light of the Court's conclusion that Nevil's findings satisfied due process requirements, Washburn's and Nofziger's subsequent approval of Nevil's findings also comported with due process.

Finally, Wood argues that Washburn, Nofziger, and Plante violated his right to due process because another AIC collected his urine sample and the resulting misconduct report contained inaccuracies, all in violation Oregon administrative rules.[13] (*See* Pl.'s Opp'n at 9-11.) Defendants respond, *inter alia*, that Oregon administrative rules governing urine sample

---

[13] OR. ADMIN. R. 291-105-0021(2)(b) requires, in relevant part, that "[t]he reviewing supervisor will ensure that the [misconduct] report is accurate, appropriate, and supported by sufficient information." OR. ADMIN. R. 291-105-0021(2)(b).

collection procedures "do not implicate" Washburn, Nofziger, and Plante because "no named defendant was personally involved" with Wood's urine sample collection. (Defs.' Reply at 3.) Further, Defendants argue that the Oregon administrative rule related to Wood's misconduct report implicates only the "reviewing supervisor," here identified in the report as "D. Lindholm." (*Id.*; *see also* Nevil Decl., Ex. 3.) On this record, the Court agrees that the Oregon administrative rules on which Wood relies do not implicate Washburn, Nofziger, or Plante. In any event, as the Court concluded above, the improper urine collection procedure and inaccuracies in the investigation report did not violate Wood's right to due process.

For these reasons, the Court grants Defendants' motion for summary judgment on Wood's due process claims against Washburn, Nofziger, and Plante.

### 2. First Amendment Claim

Wood alleges that Defendants retaliated against him in violation of his First Amendment rights by instituting false disciplinary charges that resulted in his removal from employment as a law clerk in the EOCI law library because he engaged in protected activity, including: (1) filing grievances, and (2) assisting other AICs with litigation against EOCI and for attempting to gather evidence to file a class action lawsuit based on what he perceived to be ongoing constitutional violations at EOCI. (*See* FAC ¶¶ 10, 13-14, 40-41, 44, 47-50.)

To prevail on a First Amendment retaliation claim, an AIC must satisfy five elements: "(1) . . . a state actor took some adverse action against [the AIC] (2) because of (3) that [AIC's] protected conduct, and . . . such action (4) chilled the [AIC's] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)). An AIC "does not have to allege [or demonstrate on summary judgment] a

'total chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim.'" *Id*. (quoting *Rhodes*, 408 F.3d at 568).

Defendants rely on three arguments to defeat Wood's retaliation claim: (1) Wood "never filed a grievance before his urine sample was collected . . . and he cannot invoke [any] grievance as the basis for a viable First Amendment retaliation claim[;]" (2) "[D]efendants' conduct in this case was in service of a legitimate penological goal[, n]amely, keeping unauthorized drugs out of prison[;]" and (3) "to the extent that [Wood] argues his disciplinary hearing was a ruse to have him removed from his work assignment at the [l]aw [l]ibrary, no [D]efendant named in this case was involved in that decision." (Defs.' Mot. at 13-14.)

First, the Court agrees that there is insufficient evidence in the record to support Wood's allegation that Defendants retaliated against him for utilizing EOCI's grievance system. (*See* Decl. Nina Sobotta Supp. Defs.' Mot. Summ. J. ("Sobotta Decl.") ¶¶ 4-8, demonstrating that Wood filed only one grievance in 2019 related to lighting in his cell, and that no Defendants were involved in processing that grievance.) However, Defendants do not dispute the other bases upon which Wood alleges retaliation. Wood claims his assistance to other AICs in his role as legal clerk at the EOCI law library and his pursuit of his own legal actions are activities protected by the First Amendment, and the Court agrees. *See, e.g.*, *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (holding that an AIC "assisting other [AICs] with their habeas petitions, [] encourag[ing] and offer[ing] to help [fellow AICs] in the vocational course in legal matters, and [] pursuing legal actions of his own [are] . . . protected by the first amendment"); *see also Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021) ("[T]he First Amendment right to file prison grievances and pursue civil rights litigation in the courts is fundamentally important

because '[w]ithout those bedrock constitutional guarantees, [AICs] would be left with no viable mechanism to remedy prison injustices.'" (quoting *Rhodes*, 408 F.3d at 567)).

Second, having found that Wood engaged in protected conduct, the Court turns to whether Wood has presented evidence of retaliatory motive, which usually includes, as relevant here: "proximity in time between protected [conduct] and the alleged retaliation" or "other evidence that the reasons proffered by the defendants for the adverse action were false and pretextual." *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (simplified).

Wood argues that he has provided sufficient evidence to demonstrate "a chronology of events from which retaliation can be inferred." (Pl.'s Opp'n at 16; *see also Singleton v. Hernandez,* No. 16-cv-02462-BAS-NLS, 2019 WL 644101, at *11 (S.D. Cal. Feb. 15, 2019) ("A plaintiff may of course rely on a 'chronology of events' to show retaliatory intent because a plaintiff is unlikely to have direct evidence of such an intent." (citing *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012))). "In order to establish a causal link sufficient to survive summary judgment based solely on temporal proximity, the protected activity and the adverse action must be 'very close.'" *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). Specifically, Wood alleges he notified EOCI officials in August 2019 "that he needed to gather prisoner statements and requested permission from [] Washburn to meet with [AICs] to prepare for a class action[.]"(FAC ¶ 13.) Wood was required to provide a urine sample a few months later on October 19, 2019, which led to the disciplinary hearing and rule violation.

The first problem with Wood's retaliation theory is that he has presented no evidence that Nevil, Nofziger, or Plante were aware of Wood's plan to file a class action. Although Wood alleged in his FAC that Washburn was aware because Wood contacted his law library

supervisors Bolles and Tirpiting about his class action and Bolles and Tirpiting contacted Washburn (*see* Pl.'s Opp'n at 17, citing FAC ¶¶ 13-14), Wood cannot rely on the allegations in his FAC to defeat summary judgment.[14] *See Anderson*, 477 U.S. at 256 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *see also Flaherty v. Warehousemen, Garage & Svc. Station Emp.'s Local Union No. 334*, 574 F.2d 484, 486 n.2 (9th Cir. 1978) (finding that assertions in a complaint are not evidence and do not create issues of fact).

The second problem with Wood's retaliation theory is that it relies solely on what he alleges was a lack of due process in connection with his disciplinary hearing, and the Court has already found that Defendants afforded him the process he was due. Notably, Wood does not allege that Defendants ordered the urine collection for a retaliatory purpose, nor that Defendants employed an AIC to collect only Wood's urine sample, nor that Defendants played any role in tampering with the urine sample or falsifying the toxicology report. Rather, Wood takes issue with the urine collection procedures and Defendants' weighing of the evidence of possible cross-contamination. Where there is no factual dispute that Defendants sanctioned Wood because the urine sample he provided tested positive for a controlled substance, Wood cannot meet his

---

[14] Wood also submitted a declaration in which an AIC states that he overheard a "conversation with Wood and correctional staff" that "included a statement by the correctional staff that . . . [Washburn] and other higher ranked prison official[s] wanted Wood out of the law library because he was causing them problems with filing complaints for other [AICs]." (Decl. of Samual Leisure Supp. Pl.'s Opp'n Defs.' Mot. ¶ 2, ECF No. 158.) This statement is insufficient to create an issue of fact as to Washburn's knowledge because the statement on which Wood relies is inadmissible hearsay and cannot be used to create an issue of fact. *See* FED. R. EVID. 801-02; FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]").

burden of demonstrating that Defendants found him in violation of the rules for an improper purpose.

The final problem with Wood's retaliation theory is that he cannot demonstrate that Defendants' actions served no legitimate penological purpose under these circumstances. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) ( "[The plaintiff] bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains."). The Court agrees that disciplining Wood for his positive urine sample served a legitimate penological interest of "keeping unauthorized drugs out of prison[.]" (Defs.' Mot. at 13; *see also Morris v. Ascencio*, No. 20-cv-04923-WHO, 2022 WL 254347, at *7 (N.D. Cal. Jan. 27, 2022) ("Legitimate goals of a correctional institution include the preservation of internal order and discipline and the maintenance of institutional security [which] includes keeping drugs out of the prison.") (simplified)).

Even viewing the facts in the light most favorable to Wood and drawing all reasonable inferences in his favor, the record does not support Wood's claim that Defendants retaliated against him for his protected First Amendment activities. Accordingly, Defendants are entitled to summary judgment on Wood's First Amendment claim.

### 3.    Eighth Amendment Claim

Wood alleges that Washburn, Nevil, and Plante failed to protect Wood in violation of the Eighth Amendment when they engaged in a "custom and practice in placing [AICs'] lives in danger who engage in litigation and [are] considered trouble makers" by "projecting [Wood] as am informant to other [AICs] and housing Wood in a harmful environment to place his life in jeopardy." (FAC at 15, ¶ A.) Wood asserts, *inter alia*, that Nevil and Plante revealed to other AICs that Wood had informed EOCI officials that another AIC had collected urine samples, knowing that Wood "would be labeled an informant and would be considered a snitch[.]" (*Id*. ¶¶

70-72, 75.) Wood claims that Washburn was aware of the practice and custom of "EOCI [] staff placing [AICs] in life threatening situations[.]" (*Id.* ¶ 83.) Defendants respond that Wood "failed to grieve his failure to protect claim before filing this lawsuit" as required by the Prison Litigation Reform Act ("PLRA"). (Defs.' Mot. at 15.)

The PLRA requires AICs to exhaust available administrative remedies prior to filing a . . . lawsuit challenging prison conditions." *Draper v. Rosario*, 836 F.3d 1072, 1078 (9th Cir. 2016) (citations omitted). The Ninth Circuit has held that the defendant bears the burden of proving that an administrative remedy was available to the AIC and that he failed to exhaust such remedy, because non-exhaustion is an affirmative defense. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). "Once the defendant has carried that burden, the prisoner has the burden of production." *Draper,* 836 F.3d at 1078. "That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

"The doctrine of exhaustion of administrative remedies is well established . . . and provides that no one is entitled to judicial relief for a supposed threat or injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

The Court finds that Defendants have met their initial burden of demonstrating that administrative remedies were generally available to Wood to grieve his complaint. (*See* Sobotta Decl., EOCI's grievance coordinator testimony demonstrating that Wood had previously utilized the grievance process and had filed grievances unrelated to his failure to protect claim as recently

as 2019.) Defendants have also met their burden of demonstrating that Wood failed to exhaust his available administrative remedies with respect to his failure to protect claim. (*See id*.) Specifically, Defendants submitted evidence that at the time of filing, Wood had not filed any grievances related to any ODOC officials placing Wood in a dangerous situation. (*See id*.).

The burden therefore shifts to Wood to demonstrate that the grievance process was effectively unavailable to him. In his reply, Wood does not respond to Defendants' argument that he failed to exhaust his administrative remedies as required by the PLRA. Viewing the evidence in the light most favorable to Wood and noting that Defendants bear the ultimate burden of proof to establish an exhaustion defense, the Court concludes that Defendants are entitled to entry of judgment on their affirmative defense that Wood failed to exhaust available administrative remedies for his Eighth Amendment claim. *See Hash v. Lee*, 632 F. App'x 420, 420 (9th Cir. 2016) ("The district court properly granted summary judgment on [the plaintiff's] claims against [seventeen defendants] because [the plaintiff] did not properly exhaust his administrative remedies, and he did not show that administrative remedies were effectively unavailable to him.") (citations omitted).[15]

## CONCLUSION

For the reasons stated, the Court DENIES Wood's motion for summary judgment (ECF No. 115), and GRANTS Defendants' motion for summary judgment (ECF No. 117).

DATED this 30th day of September, 2022.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[15] Having found that Defendants are entitled to summary judgment on the merits of Wood's claims, the Court does not address whether Defendants are entitled to qualified immunity.